## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **APRIL LANKFORD,** | : | **Civil No. 3:23-CV-1106** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **MARTIN O'MALLEY,** | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Until 2019, April Lankford worked as a medical practice office manager despite suffering from depression and anxiety for at least twenty-five years prior to the alleged onset of her disability. (Tr. 137-40). In January of 2020, Lankford applied for disability insurance benefits, alleging an onset of disability in September of 2019. (Tr. 315). However, following a hearing, an Administrative Law Judge (ALJ) denied Lankford's application for benefits. (Tr. 13-39). Citing her activities of daily living, history of conservative treatment and normal mental examinations, and the medical opinions of a number of experts, including two State agency consultants and a consultative examiner who found that Lankford experienced only mild limitations in her mental functional abilities, the ALJ concluded at Step 2 that Lankford's mental

1

impairments were nonsevere and did not account for any mental limitations in the residual functional capacity (RFC). Based upon this RFC determination, the ALJ found that Lankford  could perform her past work as a medical practice office manager.

Lankford now challenges this aspect of the ALJ's residual functional capacity assessment, arguing that the ALJ erred in failing to account for the mild functional limitations defined at Step 2 in the RFC determination or otherwise explain why it was unnecessary. In considering this claim, we are mindful of two guiding legal tenets. First, as the Supreme Court has recently underscored, we employ a limited scope of review when considering Social Security appeals. Our task is simply to determine whether substantial evidence supports the ALJ's decision. On this score:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.

Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
(comparing the substantial-evidence standard to the deferential clearly-
erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Second, consistent with this deferential standard of review, when we are called upon to assess whether an ALJ has sufficiently articulated a rationale for the mental and emotional components of an RFC, we have recently been instructed that this aspect of an RFC is sufficient "as long as the ALJ offers a 'valid explanation'" for the mental and emotional limitations imposed upon a worker. Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, it has been held that an ALJ offers a valid explanation for a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do . . . work; and [the claimant]'s activities of daily living, . . . ." Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

Thus, Hess tells us that the legal sufficiency of an ALJ's mental RFC assessment should not be addressed in the abstract, through a mechanical process which requires adherence to certain terms of art. Instead, this analysis should be a pragmatic consideration grounded in the evidence presented at the disability hearing. Mindful of the fact that substantial evidence "means only—'such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019), and recognizing that a mental RFC is sufficient "as long as the ALJ offers a 'valid explanation,'" for the mental and emotional limitations imposed upon a worker, <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 211 (3d Cir. 2019), we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    <u>Statement of Facts and of the Case</u>

On January 24, 2020, April Lankford filed an application for Disability Insurance Benefits (DIB), alleging that she had become totally disabled beginning on September 6, 2019, due to blind or low vision, sixth nerve palsy, anxiety, depression, asthma, high blood pressure, high cholesterol, bilateral knee replacement, bilateral reconstructive feet surgery, and spinal stenosis. (Tr. 284-85, 314-15). Lankford was born in 1955 and was sixty-three years old at the time of the alleged onset of her disability, making her a person closely approaching retirement age under the regulations. (Tr. 284, 315). She had prior employment as a medical practice office manager, where she worked from around 2004 until September 2019. (Tr. 33, 144, 315, 676).

4

This appeal advances a specific, and narrowly framed, question, challenging the sufficiency of the ALJ's analysis of Lankford's emotional impairments and specifically argues that this analysis was deficient and infirm because the ALJ did not sufficiently reconcile the RFC with his determination at Step 2 of the sequential analysis that governs social security cases that she had mild impairments in several areas of mental functioning. As we have noted, this issue cannot be addressed in the abstract, but should be evaluated in the context of the ALJ's articulated factual findings concerning Lankford's mental impairments and capabilities. In this case, the ALJ found at Step 2 of the sequential analysis which applies to Social Security appeals that Lankford's mental impairments were nonsevere. (Tr. 22-25). In so finding, the ALJ thoroughly summarized the longitudinal medical evidence with regard to her mental impairments, stating:

> On April 13, 2018, the claimant, who had been taking Sertraline and Trazodone prescribed by her primary care provider for a number of years for mental health symptoms, reported to her primary care provider feeling stable on her medications despite experiencing work stress (Exhibit 6F). On March 15, 2019, the claimant reported to her primary care provider experiencing anxiety and burn out from work after her department had gone from four (4) to two (2) employees with having to perform the same amount of work and feeling persecuted by management (Exhibit 7F). The claimant did not want to change her medications at that time (Exhibit 7F). The claimant did not undergo recommended therapy at that time (Exhibit 7F). On May 31, 2019, the claimant reported to her primary care provider that things are better at work than they had been at her last appointment (Exhibit 7F). The

claimant underwent an assessment for therapy on July 6, 2019, sharing the belief that her current medications are working and her current struggles are situational related to work (Exhibit 5F). The claimant indicated that she is on FMLA leave to protect her from getting fired and she does not want to retire until she turns sixty-five (65) so she can receive Medicare (Exhibit 5F). On July 16, 2019, the claimant reported that she is moving on September 26, 2019 with a last day of work scheduled on September 6, 2019 (Exhibit 5F). The claimant explained at that time that she is trying to get disability for trouble walking and getting around due to her size because she wants free insurance (Exhibit 5F). There is no documentation of therapy after August 24, 2019, at which time the claimant was doing well (Exhibit 5F).

On December 19, 2019, the claimant reported to her primary care provider that her mental health symptoms have been much better since she has not been working (Exhibit 7F). On February 5, 2020, the claimant's depression and anxiety were noted to be well controlled overall on Sertraline (Exhibit 17F). The claimant's Trazodone dosage was increased at that time for worsening sleep issues after she reported retiring and moving (Exhibit 17F). On June 5, 2020, the claimant's mental health symptoms were described as well controlled overall on medications despite stressors including several family members having died over the past few months (Exhibit 17F). At the consultative examination on August 12, 2020, the claimant appeared cooperative with adequate manner of relating, social skills and overall presentation and appropriate eye contact (Exhibit 14F). The claimant appeared to be of average intellectual functioning, and her attention, concentration and memory appeared intact with the ability to perform serial threes and sevens and to recall five (5) digits forward and four (4) digits backward (Exhibit 14F). The claimant's mental health symptoms were noted to be overall well-controlled on medications on December 7, 2020 (Exhibit 17F). At the consultative examination on March 23, 2021, the claimant again appeared cooperative with adequate overall presentation and appropriate eye contact (Exhibit 18F). The claimant's attention and concentration appeared mildly impaired in that she was able to count and to perform simple calculations while struggling with serial threes and sevens (Exhibit 18F). Further, the claimant's memory appeared

mildly impaired in that she was able to recall 3/3 objects immediately and with delay and four (4) digits forward and backward (Exhibit 18F). The clamant again appeared to be of average intellectual functioning at that examination (Exhibit 18F). On June 15, 2021, the claimant reported to her primary care provider wanting to focus on physical health issues before changing medication or treatment relating to her mental health symptoms, which she shared the belief were related to fatigue and physical issues (Exhibit 23F). There is no documentation of additional significant treatment with any provider for mental health symptoms, nor is there documentation of inpatient psychiatric hospitalization, participation in a partial hospitalization or intensive outpatient program, emergency treatment, treatment with a psychiatric provider or specialized mental health treatment with any provider beyond therapy the claimant attended for approximately two (2) months prior to the alleged onset date. Rather, it appears that the claimant's symptoms since that time appropriately have been managed with medications prescribed by the claimant's primary care provider without the need for more intensive interventions. Further, the record does not document the claimant's exhibition of significant dysfunctional behavior directed toward others or significant, consistent attentional, cognitive or memory deficits. This record fails to establish that mental impairments posed more than minimal functional limitations upon the claimant.

(Tr. 22-24).

The ALJ then carefully assessed the severity of Lankford's emotional impairments, describing the degree of her impairment in the following terms:

The first functional area is understanding, remembering or applying information. In this area, the claimant had no limitation. While the claimant indicates that she required reminders to take medication and to go places, she indicates that she did not require reminders to attend to her personal care needs (Exhibit 4E). The claimant indicates that she did ok with spoken instructions with repetition and she did fairly well with written instructions (Exhibit 4E). The claimant indicates that she managed her own finances (Exhibit 4E). At a consultation with a

neurology provider on April 25, 2019, the claimant's functional cognition appeared intact and her memory appeared good (Exhibit 3F). At the consultative examination on August 12, 2020, the claimant's memory appeared intact, and she appeared to be of average intellectual functioning (Exhibit 14F). The claimant's memory appeared intact at appointments with her primary care provider on September 15, 2020 and December 7, 2020, respectively (Exhibit 17F). At the consultative examination on March 23, 2021, the claimant's memory appeared mildly impaired in that the claimant exhibited 3/3 recall abilities both immediately and with delay and recalled four (4) digits both forward and backward (Exhibit 18F). The claimant appeared to be of average intellectual functioning at that examination (Exhibit 18F). When the claimant met with her primary care provider on July 2, 2021, she appeared to have an above average fund of knowledge and intact memory (Exhibit 23F). On these facts, the claimant had no limitation in understanding, remembering or applying information.

The next functional area is interacting with others. In this area, the claimant had mild limitation. The claimant has her driver's license, and she left the home to shop, to perform senior exercises and to go to the senior café (Exhibit 4E, Testimony). The claimant drove forty-six (46) miles to the consultative examination on March 23, 2021 (Exhibit 18F). While the claimant indicates that she had problems getting along with family, friends and neighbors if the relationships became negative or too stressful, she indicated that she got along great with authority figures (Exhibit 4E). At the physical consultative examination on that date, the claimant appeared friendly and well dressed, and she interacted appropriately throughout (Exhibit 19F). At mental health consultative examinations on August 12, 2020 and March 23, 2021, the claimant appeared cooperative with adequate manner of relating, social skills and/or manner of relating and appropriate eye contact (Exhibit 14F, 18F). For these reasons, the record indicates that the claimant had mild limitation in interacting with others.

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant had mild limitation. As indicated above, while the claimant indicates that she required reminders to take

medication and to go places, she indicates that she did not require reminders to attend to her personal care needs (Exhibit 4E). The claimant indicates that she did ok with spoken instructions with repetition and she did fairly well with written instructions (Exhibit 4E). The claimant indicates that she finished what she started (Exhibit 4E). At a consultation with a neurology provider on April 25, 2019, the claimant's functional cognition appeared intact, and her attention and concentration appeared within normal limits (Exhibit 3F). At the consultative examination on August 12, 2020, the claimant's attention and concentration appeared intact with the ability to count and to perform simple calculations and serial sevens and threes, and she appeared to be of average intellectual functioning (Exhibit 14F). At the consultative examination on March 23, 2021, the claimant's attention and concentration appeared mildly impaired in that the claimant was able to count and to perform simple calculations but struggled to perform serial sevens and threes (Exhibit 18F). The claimant appeared to be of average intellectual functioning at that examination (Exhibit 18F). When the claimant met with her primary care provider on July 2, 2021, she appeared to have an above average fund of knowledge (Exhibit 23F). Accordingly, the record establishes that the claimant had mild limitation in concentrating, persisting or maintaining pace.

The fourth functional area is adapting or managing oneself. In this area, the claimant had mild limitation. The claimant relocated to Pennsylvania during the fall of 2019 to a senior living community, and she lives alone there (Testimony). The claimant had no problems attending to her personal care needs (Exhibit 4E). The claimant performed household chores including caring for her cats, preparing meals, laundering clothes, dusting and performing simple household repairs (Exhibit 4E, Testimony). The claimant reported on April 16, 2020 having fallen while gardening two (2) weeks before (Exhibit 17F). The claimant has her driver's license, and she left the home to shop, to perform senior exercises and to go to the senior café (Exhibit 4E, Testimony). The claimant reported on June 15, 2021 that she performs tai chi and senior aerobics four (4) times per week (Exhibit 23F). The claimant managed her own finances (Exhibit 4E). The claimant indicated that she does ok with changes in routine (Exhibit 4E).

Therefore, the record indicates that the claimant had mild limitation in adapting or managing herself.

Because the claimant's medically determinable mental impairments caused no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they were nonsevere (20 CFR 404.1520a(d)(1)).

(Tr. 23-25).

The ALJ then formulated the following RFC for Lankford:

After careful consideration of the entire record, the undersigned finds that through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that she was capable of lifting and/or carrying ten (10) pounds occasionally and less than ten (10) pounds frequently. The claimant was capable of sitting for six (6) hours and standing and walking for two (2) hours' each in an eight (8) hour day. The claimant was capable of occasional performing of postural movements, but never climbing of ladders, ropes or scaffolds or crawling. The claimant was required to avoid moderate exposure to heights and moving machinery parts.

(Tr. 25).

This RFC assessment for Lankford rested upon the consideration of her treatment records, which the ALJ summarized at Step 2, reported activities of daily living, and the medical opinion evidence. As to her activities of daily living, the ALJ highlighted:

The claimant's activities of daily living similarly support the claimant's ability to perform work activities within the residual functional capacity

assigned. As indicated above, the claimant relocated to Pennsylvania during the fall of 2019 to a senior living community, and she lives alone there (Testimony). The claimant had no problems attending to her personal care needs (Exhibit 4E). The claimant performed household chores including caring for her cats, preparing meals, laundering clothes, dusting and performing simple household repairs (Exhibit 4E, Testimony). The claimant reported on April 16, 2020 having fallen while gardening two (2) weeks before (Exhibit 17F). The claimant has her driver's license, and she left the home to shop, to perform senior exercises and to go to the senior café (Exhibit 4E, Testimony). The claimant reported on June 15, 2021 that she performs tai chi and senior aerobics four (4) times per week (Exhibit 23F). The claimant managed her own finances (Exhibit 4E). These activities of daily living are consistent with the claimant's ability to perform work activities within the residual functional capacity assigned.

(Tr. 29).

The ALJ also considered the medical opinion evidence with regard to Lankford's mental impairments. On this score, the ALJ considered the opinions of State agency psychological consultants Dr. John Gavazzi and Dr. Thomas Fink, who opined that Lankford had no limitation in understanding, remembering or applying information, mild limitation in interacting with others, concentrating, persisting, or maintaining pace and adapting or managing herself and that she had nonsevere mental impairments. (Tr. 29). The ALJ also considered the opinion of consultative examiner Dr. John Kajic who also opined that Lankford had mild limitations in making judgments on complex work-related decisions, interacting appropriately with coworkers and supervisors and responding appropriately to usual work

11

situations, and to changes in a routine work setting, but no limitation in understanding, remembering or carrying out simple and complex instructions, making judgments on simple work related decisions or interacting appropriately with the public. (Id.) The ALJ found these opinions persuasive, explaining:

> To the extent that these opinions are suggestive that mental impairments posed no more than minimal functional limitations upon the claimant, they are supported by the absence of documentation of inpatient psychiatric hospitalization, participation in a partial hospitalization or intensive outpatient program, emergency treatment, treatment with a psychiatric provider or specialized mental health treatment with any provider beyond therapy the claimant attended for approximately two (2) months prior to the alleged onset date, the record reflecting that the claimant's symptoms since that time appropriately have been managed with medications prescribed by the claimant's primary care provider without the need for more intensive interventions and the record that does not document the claimant's exhibition of significant dysfunctional behavior directed toward others or significant, consistent attentional, cognitive or memory deficits. For these reasons, these opinions are persuasive to the extent that they are suggestive that mental impairments posed no more than minimal functional limitations upon the claimant.

(Tr. 29). Thus, in finding these opinions persuasive, and declining to adopt limitations on Lankford's mental functioning in the RFC, the ALJ highlighted Lankford's conservative mental health treatment, the fact that her mental impairments were managed with medication, and the lack of any objective evidence of significant limitations in her mental functional abilities.

The ALJ also considered the opinion of consultative examiner Dr. Leah Bielski, who found Lankford had moderate limitations in understanding, remembering and carrying out complex instructions, making judgments on complex work related decisions, interacting appropriately with the public, coworkers and supervisors and responding appropriately to usual work situations and to changes in a routine work setting and mild limitations in understanding, remembering, and carrying out simple instructions and making judgments on simple work related decisions. (Tr. 32, 884-98). The ALJ found the opinion of Dr. Bielski partially persuasive to the extent it suggested only mild limitations, but concluded that the findings of moderate limitations were too extensive, in light of:

> [T]he absence of documentation of inpatient psychiatric hospitalization, participation in a partial hospitalization or intensive outpatient program, emergency treatment, treatment with a psychiatric provider or specialized mental health treatment with any provider beyond therapy the claimant attended for approximately two (2) months prior to the alleged onset date, the record reflecting that the claimant's symptoms since that time appropriately have been managed with medications prescribed by the claimant's primary care provider without the need for more intensive interventions and the record that does not document the claimant's exhibition of significant dysfunctional behavior directed toward others or significant, consistent attentional, cognitive or memory deficits.

(Tr. 32).

Based upon this RFC determination, the ALJ concluded that Lankford could perform her past relevant work as a medical practice office manager as generally performed, skilled work with an SVP of 7 that is generally performed at a sedentary level and actually performed at a light level. (Tr. 33). Based upon these findings, the ALJ concluded that Lankford had not met the exacting disability standards prescribed by law and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal Lankford advances a single claim, arguing that the RFC determination made by the ALJ was flawed in that it failed to account for the mild limitations in three areas of mental functioning determined at Step 2 in the RFC determination. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, under the deferential standard of review that applies here, we will affirm the decision of the Commissioner.

## III.    <u>Discussion</u>

### A.    <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. <u>See</u> 42 U.S.C. § 405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record

and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

16

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review, "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather, our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that

17

decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could

function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

## B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

This is a disabled widow's disability claim. Once the threshold requirements are met to satisfy widow status,  to receive benefits by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful

activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e),  404.1545(a)(1),  416.920(e),  416.945(a)(1).  In  making  this

assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her from engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant numbers in the national economy that the claimant could perform that are consistent with the claimant's age, education, work, experience, and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in

his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

## C.    The ALJ's Decision in this Case is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), and "does not mean a large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but rather "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). We also acknowledge that an ALJ's mental RFC assessment does not have to follow any particular format and should be upheld "as long as the ALJ offers a 'valid explanation,'" for that assessment. Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019).

Judged against these deferential standards of review, we find that substantial evidence supported the ALJ's mental RFC assessment in this case. The plaintiff

argues that the ALJ erred in finding she had mild limitations in three out of four areas of mental functioning at Step 2 of the sequential analysis but adopting no mental limitations in the RFC finding without adequate explanation. To support her argument for remand, the plaintiff cites to the Tenth Circuit case, <u>Wells v. Colvin</u>, 727 F.3d 1061 (10th Cir. 2013). Indeed, this Court has recognized the requirement in <u>Wells</u> that:

> As a general matter, an ALJ must consider limitations and restrictions associated with all of a claimant's impairments, both severe and non-severe, when formulating the RFC. 20 C.F.R. § 404.1545(a)(2). "[T]he Commissioner's procedures do not permit the ALJ to simple rely on his finding of non-severity as a substitute for a proper RFC analysis." <u>Wells v. Colvin</u>, 727 F.3d 1061, 1065 (10th Cir. 2013). "A conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ to simply disregard those impairments when assessing a claimant's RFC and making conclusions at step four and five." <u>Id.</u> at 1068–69.

<u>Kich v. Colvin</u>, 218 F. Supp. 3d 342, 355–56 (M.D. Pa. 2016). Thus, it is well settled that, despite a finding of non-severe mental impairments at Step 2, an ALJ must at least consider those impairments when fashioning the RFC.

However, "the ALJ's consideration of the individual's non-severe impairments does not amount to a requirement that the ALJ must include limitations in the RFC associated with mild impairments." <u>Weidner v. Kijakazi</u>, No. CV 20-1250-MN, 2022 WL 610702, at *9 (D. Del. Feb. 1, 2022), <u>report and recommendation adopted,</u>

No. CV201250MNSRF, 2022 WL 610678 (D. Del. Feb. 16, 2022) (citing Smith v. Comm'r of Soc. Sec., 2016 WL 3912850, at *9 (D.N.J. July 19, 2016)). Instead, the requirement in Wells that an ALJ must explain the reasons for excluding mild mental functional limitations is cabined by the Third Circuit's holding in Hess that an ALJ's mental RFC assessment should be upheld "as long as the ALJ offers a 'valid explanation,'" for that assessment. Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). Indeed, as previously noted, an ALJ offers a valid explanation of a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . ." Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019). See also Shaffer v. Colvin, 2014 WL 4925067, at *5 (W.D. Pa. Sept. 30, 2014) ("It is clear from the record that the ALJ adequately considered all of the relevant medical evidence, as well as plaintiff's reported activities, in assessing plaintiff's residual functional capacity, and that he incorporated into his finding all of the limitations that reasonably could be supported by the medical and other relevant evidence."); McCafferty v. Astrue, 2008 WL 1869282, at *4 (E.D. Pa. Apr. 25, 2008) (finding that the requirements of SSR 96-8p were satisfied by ALJ's narrative discussion of the claimant's functional limitations in the context of the objective medical evidence,

24

doctors' notes and opinions, the claimant's activities of daily living, and the claimant's subjective complaints).

The plaintiff provides a robust line of caselaw supporting this proposition that an ALJ errs in failing to account for even mild mental limitations in the RFC without valid explanation. But, where the plaintiff has provided much legal support for her argument, she has failed to highlight evidence which explains precisely what mental limitations would have precluded her from performing her past work. Indeed, the plaintiff has foregone a recitation of the medical evidence, instead relying on a solely legal argument that a remand is always required where an ALJ finds mild limitations at Step 2 but does not explicitly account for those limitations in the RFC. The plaintiff bolsters her argument by explaining that her past work is considered skilled work and thus any limitations at Step 2 would preclude her from performing it.

However, in our view, the ALJ's decision not to include mental limitations in the RFC was both adequately articulated and supported by substantial evidence. At the outset, the ALJ thoroughly considered and analyzed the longitudinal medical evidence with regard to Lankford's mental impairments at Step 2. The ALJ then conducted a thorough "paragraph B" analysis, detailing each of the four broad functional areas, finding only mild limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing herself.

(Tr. 24). The ALJ noted "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . ." Hess, 931 F.3d at 214. The ALJ then acknowledged that "[t]he following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (Tr. 25).

The RFC assessment at Step 5 focuses on a summary of the longitudinal medical evidence of her severe physical impairments since the medical evidence of her nonsevere impairments was summarized at Step 2. But the Step 5 analysis does consider how her ability to perform her activities of daily living supports the mental RFC determination, noting that she lives alone, has no problems attending to her personal care needs, can perform household chores and simple repairs, leaves home to shop, perform senior exercises and go to the senior café, performs tai chi and senior aerobics four times per week, and manages her finances. The ALJ's RFC analysis also considered the opinion evidence of three psychological consultants whose opinions he found persuasive, and one whose opinion he found partially persuasive, highlighting her conservative mental health treatment, the fact that her mental impairments were managed with medication, and the lack of any objective evidence of significant limitations in her mental functional abilities. In our view, this

26

is an adequate assessment of the evidence supporting the ALJ's decision not to include her mild limitations in mental functioning in the RFC. See Weidner 2022 WL 610702 at *10 ("The ALJ appropriately exercised his discretion in declining to include limitations addressing Weidner's mental impairments in the hypothetical posed to the VE or the RFC assessment based on the thin evidence of limitations caused by those alleged impairments").

Moreover, we reject the plaintiff's argument that mild limitations in "paragraph B" criteria *per se* preclude her from performing skilled work. Indeed, other courts have found claimants capable of skilled work despite these mild limitations. See O'Connor v. Commissioner Social Sec., 466 Fed. Appx. 96 (3d Cir. 2012) (finding claimant was capable of performing skilled work as an attorney despite mild limitations in mental functioning); Weidner, 2022 WL 610702 (finding no error where the ALJ found claimant could return to past semi-skilled and skilled work despite mild mental impairments); Pividori v. Colvin, No. CV 15-1290, 2016 WL 6647912, at *4 (W.D. Pa. Nov. 10, 2016) (collecting cases rejecting argument that mild limitations in the broad functional areas is incapable of skilled work). Indeed, these are fact-bound determinations and, here, there is substantial evidence supporting the ALJ's conclusion that Lankford could perform her past work. In fact, her examinations revealed average intellectual functioning and intact memory, she

indicated she gets along great with authority figures, interacts appropriately with healthcare providers, has her driver's license, shops, performs senior exercises and goes to the senior café, can attend to her personal care needs, does ok with spoken instructions with repetition and did fairly well with written instructions, performs tai chi and senior aerobics four times per week, manages her own finances, and does ok with changes in routine. (Tr. 23-25, 115-151, 327-340).[1]

Finally, even if the ALJ erred in finding Lankford capable of her past skilled work with mild limitations in three of the four "paragraph B" criteria, any error would be harmless since, at the hearing, the vocational expert testified that there were three other sedentary occupations at an SVP 4, considered semi-skilled,[2] to

---

[1] Moreover, as the ALJ pointed out, in a 2019 assessment Lankford stated that she had intended to retire from her full-time position but did not want to have to pay for health insurance prior to turning 65. (Tr. 677). On July 16, 2019, she reported that she was trying to get disability for trouble walking and getting around due to her size because she wants free insurance. (Tr. 22, 686).

[2] Under recent policy guidance:

> 20 CFR 404.1568 and 416.968. We consider occupations with specifical vocational preparation (SVP) levels one and two to be unskilled. Occupations with SVPs of three and four are semi-skilled, and occupations with an SVP of five or greater are skilled. See POMS DI 25015.015 Work Experience as a Vocational Factor, available at: https://secure.ssa.gov/apps10/poms.nsf/lnx/0425015015 and DOT Appendix C, available at: https://www.occupationalinfo.org/appendxc_1.html#II and. For additional information about how we consider skills from past work

which Lankford's skills could transfer, including Clerk Typist, DOT 203.362-010,

Data Entry Clerk, DOT 203.582-054, and Admitting Clerk, DOT 205.362-018. (Tr.

145-46). Each of these occupations has a reasoning level of three. As this Court has

noted, to show harmful error:

> Plaintiff would have to demonstrate that [s]he was incapable of performing reasoning level 3 jobs, which requires an individual to "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." (Pl. Brief at 23). The only medical expert in the record opined that Plaintiff's mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace were non-severe. (Tr. 81). A non-severe impairment is a "slight abnormality" causing "no more than a minimal effect on an individual's ability to work." Bowen v. Yuckert, 482 U.S. 137, 154, 107 S. Ct. 2287, 2298, 96 L.Ed. 2d 119 (1987). "[E]ven if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA." SSR 85-28. If an impairment is non-severe, then Plaintiff retains "the ability to perform basic work activities, as required in most jobs. Examples of these are...seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding

---

under our rules, see SSR 82-41: Titles II and XVI: Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations Effective February 26, 1979.

Social Security Ruling, SSR 24-1p. Titles II and XVI: How We Apply Medical-Vocational Profiles, Federal Register Vo. 89, No. 110, pg 48477 n.18. Available at: https://www.ssa.gov/OP_Home/rulings/di/02/SSR2024-01-di-02.html.

appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." Id.

Kuntz v. Colvin, No. 115CV00767SHRGBC, 2016 WL 6634942, at \*9 (M.D. Pa. Sept. 30, 2016), report and recommendation adopted, No. 1:15-CV-767, 2016 WL 6599994 (M.D. Pa. Nov. 8, 2016). Thus, even if Lankford were incapable of performing her past work due to her mild mental impairments, substantial evidence reveals that other jobs existed in the national economy that she would be capable of performing. Moreover, as previously noted, the plaintiff has pointed to no specific mental limitations that would prevent her from performing basic work activities. Id. (citing Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005) ("Plaintiff cannot demonstrate that any error was harmful without identifying the additional limitations the ALJ should have included in the RFC"). In fact, substantial evidence supports the ALJ's determination that she could perform these duties.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law, was adequately articulated, and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial

30

evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case. Therefore, this decision will be affirmed.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed and the plaintiff's appeal denied.

An appropriate order follows.

*/S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: December  11, 2024